THOMPSON, Judge.
J.E.J. (“the mother”) appeals the termination of her parental rights to her children, R.J. (“the daughter”) and twin boys Z.J. and T.J. (all three children are hereinafter together referred to as “the children”).
The family first came to the attention of the Department of Human Resources (“DHR”) in 1994, when DHR received an indicated report that the children were at risk of injury and that the children’s hygiene was inadequate. At that time, DHR also became concerned about the truancy of J.J., the children’s older half brother. In 1994, the mother moved the family to Kentucky for two years; Kentucky’s social services agencies provided services to the family during that time.
The mother moved the family back to Alabama in November 1996, but she failed to enroll any of her children, who were all school-age, in school. In May 1997, DHR removed the children from the mother’s home because of an indicated report of inadequate shelter and inadequate hygiene, and also because of the mother’s failure to enroll the children in school.
When the children were taken into protective custody in May 1997, the mother agreed to allow W.I. and L.I., friends of the mother’s sister, to have temporary custody of the children. The trial court entered a temporary-custody order incorporating the terms of that agreement. The trial court also ordered DHR to provide services to the family. The children were returned to the mother’s custody in August 1997, but remained in her home for only three weeks; the record does not indicate the reason the children were again taken into protective custody.
The mother filed three petitions seeking the return of the children. The trial court conducted hearings on each petition, and it entered judgments denying each petition. Except for the three-week period in August 1997 when they were returned to their mother, the children have been in the custody of W.I. and L.I. since May 1997.
On February 12, 2001, W.I. and L.I. filed a petition seeking to terminate the mother’s parental rights. DHR was not a party to that action to terminate the mother’s parental rights, and it is not a party to this appeal. The trial court heard ore tenus evidence over the course of a two-day hearing.
During the termination hearing, Hope Skelton, a DHR social worker assigned to the case, testified that since May 1997, the children had been — except for a three-week period — in the custody of W.I and L.I., not in. DHR’s custody. Therefore, Skelton testified, W.I. and L.I., and not *78 DHR, made decisions regarding the children. However, pursuant to orders of the trial court, from May 1997 until early 2001, DHR provided counseling services for the children and also offered various services to the mother. Skelton testified that it was unusual for DHR to provide services for such a long period when the children involved were not in DHR’s custody.
Each of the children testified during the termination hearing. The daughter, who was 13 years old at the time of the hearing, testified that when the children lived with the mother, the mother did not feed them properly or attend to their hygiene. The daughter testified that although she loved the mother, she did not believe the mother was capable of taking care of her two brothers and her. The testimony of Z.J. and T.J. was similar to the daughter’s testimony. All three children wanted W.I. and L.I. to adopt them.
L.I. testified that when she first obtained custody of the children in May 1997, they were suffering from malnutrition and their teeth were rotten. L.I. testified that R.J. was nine years old, and the twin boys were seven years old when she first obtained custody of them in May 1997. At that time, the children did not know their ABC’s or know how to count. L.I. testified that she had seen positive changes in the children in the four and one-half years she and her husband had had custody of them.
Glenn McGargy,[1] a licensed professional counselor, testified that she counseled the children from May 1997 until nine months before the hearing in this matter. McGar-gy testified that when the children first went to live with W.I. and L.I., they were behind in their schooling, they were in poor health, and they were fearful of people. McGargy testified that she observed a significant improvement in the children, and that, when she last saw them nine months before the termination hearing, they were normal, bright, healthy children who made good grades and were active in extracurricular activities.
The mother testified that during the time the children were out of her custody, she was willing to do anything to ensure that they were returned to her. However, Skelton testified that when she informed the mother that she needed to attend mental-health counseling to regain custody of the children, the mother ignored her. Skel-ton testified that DHR paid for counseling for the mother at two different times, but that, on both occasions, the mother terminated the counseling sessions.
McGargy counseled the children, the mother, and J.J., the children’s half brother, in 1997. McGargy testified that counseling for the mother and J. J. was sporadic and lasted a little over one year. McGar-gy believed that the mother was incapable of adequately taking care of the children because, McGargy testified, the mother’s thinking was “bizarre and distorted.” McGargy also testified that the mother had strange parenting ideas. As examples of the mother’s strange parenting ideas, McGargy testified that the mother had-told her that she refused to feed the children green vegetables for fear they would be poisoned and that she had given the children chocolate milk daily because she believed it would prevent learning disabilities.
McGargy testified that the mother thinks her reasoning and parenting are perfectly acceptable and that that belief hindered any treatment of the mother. Although McGargy testified that she does not make psychological diagnoses, on ques *79 tioning by the mother’s attorney, McGargy testified that she believed the mother was “at the edge of being schizophrenic.”
During supervised visitation with the children, the mother frequently behaved inappropriately. The mother encouraged the children to say that they wanted to go home with her. Also, the mother was often verbally abusive to the DHR workers or became loud and yelled at the workers and the children. DHR decided to move the visits to public places in order to discourage the mother’s disruptive behavior, but, although that practice worked for a short time, the disruptive behavior soon resumed. Because of the mother’s behavior during the supervised visits, the DHR social workers and the mother entered into a written agreement specifically detailing the conduct from which the mother was to refrain during visitation. However, the mother did not comply with that agreement, and in December 1999, DHR refused to supervise any further visitation between the mother and the children. The mother has not visited with the children since that time.
The mother does not know the identities of the children’s fathers. J.J., who was 20 years old at the time of the termination hearing, lived with the mother in the mother’s two-bedroom house. Neither J.J. nor the mother is employed. The- mother and J.J. receive a total of $550 per month in food stamps and Supplemental Security Income (“SSI”) benefits. The mother has been unemployed since November 2000. The mother testified that she lost her job because her car broke down, and she did not have transportation to work. The mother stated that she intended to look for employment if the children were returned to her custody.
The mother testified that she had made some improvements to the house in compliance with DHR’s requests. The mother also testified that before May 1997, when the mother agreed to allow W.I. and L.I. to have custody of the children, she had provided proper medical treatment for the children and had fed them appropriately. The mother repeatedly testified that she loved the children and that she wanted them returned to her custody.
During her testimony before the trial court, the mother often refused to answer questions that were pertinent to the question of her ability to care for the children. Also, the mother testified that DHR had attempted to kill the children, that DHR had blackmailed her into seeing a psychologist, and that DHR was involved in a conspiracy to sabotage her ability to regain or maintain custody of her children.
D.V.B., the mother’s sister, testified that the conditions in the mother’s home were sometimes deplorable and that she had observed occasions when the children’s hygiene was not adequate and there was not enough food in the mother’s home. Also, D.V.B. testified that she had asked the mother to seek counseling, but that the mother had denied that she needed counseling. D.V.B. testified that neither she nor the mother’s brother could take custody of the children and serve as alternate relative resources.
Based on the evidence before it, the trial court concluded that the children were dependent and that their best interests would be served by terminating the mother’s parental rights. Section 26-18-7, Ala. Code 1975, which sets forth the statutory authority for the termination of parental rights, provides:
“(a) If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to *80 render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
“(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
“(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for [the] needs of the child.
“(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat, or otherwise maltreat the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling.
“(4) Conviction of and imprisonment for a felony.
“(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent.
“(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
“(7) That the parent has been convicted by a court of competent jurisdiction of any of the following:
“[Listing offenses.]
“(8) That parental rights to a sibling of the child have been involuntarily terminated.
“(b) Where a child is not in the physical custody of its parent or parents appointed by the court, the court, in addition to the foregoing, shall also consider, but is not limited to the following:
“(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
“(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private child care agency, and agreed to by the parent.
“(3) Failure by the parents to maintain consistent contact or communication with the child.
“(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review.”
This court has stated:
“Every parent has a prima facie right to custody of his or her child and that right can only be overcome by a showing of clear and convincing evidence that removing the child from the parent’s custody would be in the best interests of the child. M.H.S. v. State Dep’t of Hu *81 man Resources, 636 So.2d 419 (Ala.Civ.App.1994).
“ ‘The trial court is given the authority to terminate parental rights if it finds from clear and convincing evidence that the parents are unable or unwilling to discharge their responsibilities to and for the children. § 26-18-7, Ala.Code 1975. The trial court shall consider whether the parents have abandoned their children, whether the parents have problems with drugs or alcohol, and whether reasonable efforts to rehabilitate the parents have failed. § 26-18-7(a), Ala.Code 1975. If the children are not in the physical custody of their parent or parents, the trial court shall also consider such circumstances as whether the parents have provided material needs for the children, whether the parents have maintained regular, scheduled visits with the children, and whether the parents have adjusted their circumstances to meet the needs of the children according to agreements reached administratively or judicially. § 26-18-7(b), Ala.Code 1975.’
“M.H.S. v. State Dep’t of Human Resources, 636 So.2d at 421.
“Where a nonparent petitions to terminate a parent’s parental rights, the trial court must apply a two-pronged test. Ex parte Beasley, 564 So.2d 950, 952 (Ala.1990). The trial court must first determine that the child is dependent. Id. After finding the child dependent, the court must examine viable alternatives to the termination of parental rights. Id. On appeal, the trial court’s determination is presumed to be correct, and it will not be reversed absent a showing that the decision is so unsupported by the evidence as to be plainly and palpably wrong. M.H.S. v. State Dep’t of Human Resources, supra. In a proceeding to terminate parental rights, the paramount consideration of the trial court, and of this court, is the best interests of the children involved. Id.”
A.R.E. v. E.S.W., 702 So.2d 138, 139-40 (Ala.Civ.App.1997).
On appeal, the mother argues that the trial court erred in “allowing DHR to withdraw” from this matter after it awarded custody of the children to W.I. and L.I. In making this argument, the mother contends that DHR filed a motion seeking to withdraw from the action and that the trial court granted that motion. However, neither a motion to withdraw nor any purported ruling on that motion is contained in the record on appeal. It is the appellant’s responsibility to ensure that the record on appeal contains sufficient evidence to justify a reversal. State ex rel. Gibson v. Gibson, 555 So.2d 1092 (Ala.Civ.App.1989). Further, the mother should have challenged the ruling allowing DHR to withdraw as a party at the time the trial court entered its order.
Out of an abundance of caution, however, we note that the record indicates that the mother agreed to place the children in the temporary custody of W.I. and L.I., rather than in DHR’s custody. The trial court then entered a judgment awarding custody to W.I. and L.I. and incorporating the terms of that agreement. DHR did not have custody of the children, and it had no legal interest in the custody of the children. Thus, DHR was not a proper party to the action before the trial court once custody had been awarded to W.I. and L.I. See Doremus v. Business Council of Alabama Workers’ Comp. Self-Insurers Fund, 686 So.2d 252, 253 (Ala.1996) (“To be a proper party, the person [or entity] must have a real, tangible legal interest in the subject matter of the lawsuit.”); Eagerton v. Williams, 433 So.2d 436, 447 (Ala.1983) (a proper party must have “an *82 interest in the right to be protected” in order to be a proper party); Bagley v. City of Mobile, 352 So.2d 1115, 1118 (Ala.1977) (in order to be a proper party to an action, “[the party] must have, either individually or in a representative capacity, an interest in the right to be protected”). We note that although DHR was not a party to this matter, it remained involved with the parties because the trial court ordered it to provide services designed to attempt to reunify the family.
The mother also argues that the trial court erred in terminating her parental rights because, she said, it did not set a specific time by which she was to have completed all requirements necessary to regain custody of her children. We note that the mother has impermissibly raised this issue for the first time on appeal. See Andrews v. Merritt Oil Co., 612 So.2d 409 (Ala.1992) (an appellant may not raise an issue for the first time on appeal). Further, there is no statutory requirement that a specific time be set for a parent to reach the goals for regaining custody that are set forth in an individualized service plan (“ISP”). Also, the record indicates that the primary goals of the ISP’s for the family in this case were for the mother to attend counseling and to obtain employment. At the time of the hearing, the mother had been unemployed for almost one year. Further, during almost the entire four and one-half years the children were in the custody of W.I. and L.I., the mother refused to attend counseling sessions. The mother does not argue how setting a time limit for her to reach those goals would have assisted her in regaining custody of the children, especially given the fact that she refused to meet those goals in the four and one-half years the children were in the custody of W.I. and L.I.
The mother’s primary argument on appeal is that the evidence does not support the trial court’s decision to terminate her parental rights. In its judgment terminating the mother’s parental rights, the trial court detailed many of the facts of this case. It then concluded:
“It is the opinion of this Court that the Department of Human Resources has made all reasonable efforts to reunify the minor children with the natural mother. However, the natural mother has completely spurned all efforts. She has refused to cooperate, change her lifestyle, or do anything that would benefit the minor children. The natural mother [is] delusional. She sees life as if it is all a big conspiracy to get her and that everyone is against her. The Court has observed these children now since 1997. The difference in these children today [from] 1997 is remarkable. This is due almost entirely [to] the efforts of [W.I. and L.I.], who have made these children normal, healthy and happy children.”
The mother maintains that DHR could have done more to assist her in reuniting with the children. However, the evidence indicates that the mother refused mental-health counseling and that she did not seek employment. The evidence in the record on appeal supports the trial court’s determination that DHR attempted to assist the mother but that she refused that assistance.
The mother asserts that the record does not support a conclusion that she is unwilling to properly parent the children. The mother repeatedly stated that she loves the children and that she wants them to be returned to her custody. However, the mother’s actions and her failure to even attempt to alter her circumstances to better meet the needs of the children belie that assertion. See § 26-18-7(b)(4), Ala. *83 Code 1975. Even assuming that the mother is willing to care for the children properly, we must also conclude that evidence supports a conclusion that she is unable to do so. The record clearly indicates that the mother has suffered from some sort of mental illness, that she refuses to or is unable to recognize that fact, and that she has refused mental-health counseling. The record indicates that there are no relatives willing or able to take the children. Given the foregoing, together with the evidence pertaining to the change in the children since they have been in the custody of W.I. and L.I., we must conclude that the trial court did not abuse its discretion in terminating the mother’s parental rights to her children.
AFFIRMED.
YATES, P.J., and CRAWLEY, PITTMAN, and MURDOCK, JJ., concur.

. The name of this witness was also spelled “Lynn Magagree” in the record; in this opinion, we use the spelling the trial court used in its judgment.